J-A23030-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LUIS MIQUEL LOPEZ | : | |
| | : | |
| Appellant | : | No. 1334 MDA 2023 |

Appeal from the Judgment of Sentence Entered June 16, 2023
In the Court of Common Pleas of Juniata County Criminal Division at
No(s): CP-34-CR-0000086-2020

BEFORE: BOWES, J., OLSON, J., and STABILE, J.

MEMORANDUM BY OLSON, J.: **FILED: APRIL 11, 2025**

Appellant, Luis Miquel Lopez, appeals from the judgment of sentence entered on June 16, 2023, as made final by the denial of Appellant's post-sentence motion on August 22, 2023. We affirm.

The Commonwealth charged Appellant with numerous crimes, including criminal homicide and endangering the welfare of a child ("EWOC"). The case proceeded to a jury trial, which took place from May 1 through 4, 2023, and where the following evidence was introduced.

G.S. testified that, on January 23, 2020, she was 14 years old and living in a house with her mother, C.S. (hereinafter "the Victim"), Appellant,[1] and her five younger siblings, D.S., M.S., V.S., L.S., and Y.S. N.T. Trial, 5/1/23,

---

[1] G.S. testified that, at the time, Appellant was the Victim's boyfriend. N.T. Trial, 5/1/23, at 40.

at 37-39 and 45.  At the time, Y.S. (hereinafter "the Baby") was six months old and would sleep in the Victim's bed.  *Id.* at 39, 43, and 46.

As G.S. testified, on the night of January 23, 2020, Appellant, the Victim, and the Baby were in the bedroom on the second floor, while G.S. and her four other siblings were sleeping in G.S.'s attic-bedroom.  *Id.* at 40.  G.S. testified that, at some time after midnight on January 24, 2020, she was "woken up to screaming."  *Id.* at 41.  She testified:

> [The Victim] called for me.  She said, [G.S.], come down and help me; and I ran down the stairs.  My brother, [D.S.], followed me down; and I told my brother, [M.S.] to stay with my sisters upstairs.
>
> . . .
>
> [When I entered Appellant and the Victim's second-floor bedroom, I found the Victim lying] on the ground covered in blood, stab wounds; and there was a broken knife on the floor, and [Appellant] was running down the stairs in that moment when I was down there.  My brother went in.  The last thing [the Victim] said to me was, call 911, I'm dying.

*Id.* at 42-43.

G.S. testified that, in response:

> I started looking for [the Victim's] phone; and I was looking in the bed, and I found [the Baby] underneath the blankets sitting up.  I grabbed him, gave him to my brother, and my brother ended up finding the cell phone, and I dialed 911.

*Id.* at 43.

Trooper Michael Lorenzo of the Pennsylvania State Police testified that he was dispatched to the scene of the crime at around 4:10 a.m. on January 24, 2020.  *Id.* at 85.  Trooper Lorenzo testified that he arrived on scene at

approximately 4:18 a.m. and saw Appellant, with his hands out, approaching the police vehicle. *Id.* at 86. Trooper Lorenzo detained Appellant and heard Appellant say "I'm sorry. I didn't mean to hurt her. . . . [I] was on a three-day cocaine binge." *Id.* at 89.

Trooper Lorenzo proceeded into the house and walked up to the second-floor bedroom, where he saw the Victim lying unresponsive on the floor. He testified that he "didn't feel a pulse" on the Victim and began CPR; at that point, he realized that the Victim's shirt "was saturated in blood." *Id.* at 94-95. Trooper Lorenzo testified that EMS arrived some time later and relieved him of his first-aid duties. *Id.* at 96. The Victim, however, later "died due to multiple sharp-force injuries." *Id.* at 154.

Trooper Lorenzo testified that, while he was on-scene, he observed: a bloody butcher knife, located near the second-floor steps, with a broken handle and the knife, itself, bent almost into a "U" shape; a fillet knife, located near the Victim's body, that was "broken in half" with the "top broken off, so the handle was still with part of the blade and then the top portion of that blade was missing;" "blood all over the bed;" "a large pool of blood near the foot of the bed;" and, "blood on the wall [and] ceiling." *Id.* at 91 and 98-99.

Trooper Lorenzo's partner that night was Trooper Daniel Cherry. Trooper Cherry testified that, after Appellant was detained and *Mirandized*,[2] Appellant told the Trooper:

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

that he had stabbed [the Victim] about [ten] times. He didn't mean to do it, that there was a Hispanic that he was told that was out to get him and that he was up all night looking out the windows, and he was afraid this guy was coming to get him. And he told me a couple times that he used cocaine, and he had been on a cocaine binge and he hadn't gone to work because he was on this cocaine binge. . . .

He said that he had gone to bed with the knives in his pockets and that he – he heard a noise. He said [the Victim] asked him to turn the heat up, and he got out of bed and turned the heat up and laid back down and then he believed that somebody was in the room so he pulled the knife out and started stabbing. And he heard a female voice say, stop, you're stabbing me, and then he realized he – what had happened.

*Id.* at 114-115.

The Commonwealth, however, presented evidence tending to show that Appellant murdered the Victim because the Victim was planning to end their relationship. *See*, *e.g.*, N.T. Trial, 5/2/23, at 5-97.

Pennsylvania State Police Corporal Joseph Short was the lead investigator on the case and testified that he was present for the Victim's autopsy. Corporal Short testified that, during this autopsy, he observed: "an extensive amount of injuries to [the Victim's] body. Based on my own observations, counting them individually, . . . I came up with a total number of stab wounds to be greater than 40 stab wounds – stabbing or cutting wounds." N.T. Trial, 5/1/23, at 154-155. Further, Corporal Short testified that he found "the top half – at least a fragment of the top half of the [broken] fillet knife . . . in the sheets [of] the bed." N.T. Trial, 5/2/23, at 59.

The jury found Appellant guilty of third-degree murder, EWOC (graded as a second-degree felony), recklessly endangering another person, possession of a small amount of marijuana for personal use, and possession of drug paraphernalia.[3] On June 16, 2023, the trial court sentenced Appellant to serve an aggregate term of 25 years and 15 days to 53 years and 30 days in prison for his convictions. *See* N.T. Sentencing, 6/16/23, at 63. With respect to the EWOC conviction, the trial court sentenced Appellant to serve a term of three years and nine months to ten years in prison. *Id.* at 62-63. During sentencing, the trial court explained:

> And I did want to say on the record that for the [EWOC] charge, that sentence is in the aggravated range; and that is due to, obviously, the severity of [Appellant's] actions.
>
> I find that – that he stabbed the [Victim] in this case while [the Baby] was laying next to her in the bed repeatedly. The attack continued throughout the room while [the Baby] was there. [The Baby] was eventually found in the bed under the covers. And throughout trial, we saw the bloodstains on that bed and covers and throughout the room. And for those reasons, I did aggravate the sentence as to that charge.

*Id.* at 63-64.

Appellant filed a timely post-sentence motion, where he claimed (among other things) that his sentence was excessive because:

> [The trial court] failed to place on the record an adequate reason[] for the sentence imposed[] and failed to impose an individualized sentence without considering mitigation

---

[3] 18 Pa.C.S.A. §§ 2502(c), 4304(a)(1), and 2705 and 35 P.S. § 780-113(a)(31)(i) and (32), respectively.

evidence offered by [Appellant's] counsel and instead imposed the maximum sentence allowed.

Specifically, the [trial court] erred in imposing an aggravated range sentence on [the EWOC conviction], in that its justification for doing so was based solely on the severity of the violence toward the [Victim] without considering other relevant factors and mitigating circumstances.

Appellant's Post-Sentence Motion, 6/26/23, at 3-4.

The trial court denied Appellant's post-sentence motion on August 22, 2023 and Appellant filed a timely notice of appeal. Appellant raises two claims on appeal:

1. Whether the evidence at trial was sufficient to prove beyond a reasonable doubt that Appellant committed the crime of [EWOC] where the Commonwealth failed to present evidence of [the Baby's] physical proximity in relation to the Victim at the time the knives penetrated the Victim, instead conced[ing] the distance between [the Baby] and the Victim was unknown, and where the Commonwealth argued the [Baby] was unharmed?

2. Whether the trial court erroneously sentenced Appellant to an aggravated range sentence based on facts and information not in evidence or presented to the court by the Commonwealth and where the [court] failed to place adequate reasons on the record for the aggravated sentence?

Appellant's Brief at 6.

First, Appellant claims that the evidence was insufficient to support his EWOC conviction. We review Appellant's sufficiency of the evidence challenge under the following standard:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying

the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Callen***, 198 A.3d 1149, 1167 (Pa. Super. 2018) (citations and quotation marks omitted).

Appellant was convicted of EWOC under 18 Pa.C.S.A. § 4304(a)(1). This section provides:

(1) A parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support.

18 Pa.C.S.A. § 4304(a)(1).

Moreover, Appellant's EWOC conviction was graded as a second-degree felony. The grading resulted from application of Section 4304(b)(1)(iii) and (2). These subsections provide:

(b) Grading.—

(1) Except as provided under paragraph (2), the following apply:

. . .

> (iii) If, in the commission of the offense under [Section 4304](a)(1), the actor created a substantial risk of death or serious bodily injury, the offense constitutes a felony of the third degree.
>
> . . .
>
> (2) The grading of an offense under this section shall be increased one grade if, at the time of the commission of the offense, the child was under six years of age.

18 Pa.C.S.A. § 4304(b)(1)(iii) and (2).

On appeal, Appellant claims that the evidence was insufficient to support his EWOC conviction because there was no evidence "that [the Baby] was near [the Victim] or Appellant when the [Victim] was stabbed." Appellant's Brief at 21. This claim fails.

As the trial court explained:

> Appellant's conviction for [EWOC] arose from facts indicating that [the Baby], an infant . . . who was six months old at the time of [the] Victim's murder, [was] present in the bed shared by [the] Victim and Appellant at the time when Appellant first attacked [the] Victim.
>
> . . .
>
> [S]ufficient circumstantial evidence was presented by the Commonwealth to convince the jury to convict Appellant of [EWOC] based on testimony and physical evidence that the attack on [the] Victim took place in close proximity to [the Baby] and therefore placed [the Baby] in danger of death or serious physical injury.
>
> [The trial court] noted that [the Baby] was discovered in the bed where the murder took place. G.S., the eldest daughter of the [Victim], testified that [the Baby] typically slept in the [Victim's] bedroom and that [the Baby] was sleeping in [the] Victim's bedroom on the night of the murder. . . . G.S. testified that she discovered [the Baby] in the bed, laying

underneath the blankets, while searching for her mother's cell phone in order to call for help. G.S. then removed [the Baby] from the bed and placed him in the arms of her brother, D.S., a minor, who was in the room with her, so that he could ensure the infant's safety. G.S. and D.S. are the only witnesses to have observed [the Baby] in the bed because D.S. had already taken physical control over the infant when [the] Pennsylvania State Police [] arrived at the scene. D.S. testified that G.S. discovered the infant under the bed sheets and that the bed was covered in blood.

The [trial] court also noted on the record that evidence and testimony showed that the sheets and blankets under which [the Baby] was discovered were stained with [the] Victim's blood. Trooper Michael Lorenzo . . . testified [he] observed that the bed sheets were covered in blood[,] as were the wall, ceiling, and floor surrounding the bed. Trooper Lorenzo stated that G.S. informed him that [the Baby] had been recovered from the bed after being discovered when she came to offer aid to her mother.

Corporal Joseph Short later arrived at the scene to investigate the murder. Corporal Short testified that he observed a significant quantity of blood on the bed, indicating that was the place where the attack took place. A photograph of the bed, covered in blood, was introduced as "Commonwealth Exhibit 5". The prosecution also introduced "Exhibit 12", a knife discovered by Corporal Short next to the wall where [the] Victim lay, and "Exhibit 13", a "fragment" of the blade of that same knife. "Exhibit 13" was found in the sheets of the bed near where [the Baby] lay before he was recovered by his elder siblings. A second knife, broken into two pieces, was discovered in the hallway just outside of the bedroom and was admitted into evidence as "Exhibit 14", the blade of the knife, and "Exhibit 15", the knife handle. The admission into evidence of these two knives, broken by the extreme force used by Appellant when stabbing Victim, clearly conveyed to the jury and to the court the brutality with which Appellant carried out the attack on [the] Victim.

. . .

Even though no direct evidence was offered as to the precise location of [the Baby] in relation to [] Appellant and the

- 9 -

> Victim, there was sufficient circumstantial evidence to lead the jury to determine that an attack took place, that the attack commenced in the bed, and that [the Baby] was in the bed during the attack. . . . The jury reasonably inferred that [the Baby] was within striking distance of Appellant and therefore was in substantial danger of death or serious bodily harm.

Trial Court Opinion, 12/18/23, at 2-4 and 7 (footnotes and citations omitted).

We agree with the trial court's able analysis and further note that Appellant essentially admitted he began this vicious assault by blindly stabbing the Victim, in the dark, in the same bed where the Baby was later found. ***See*** N.T. Trial, 5/1/23, at 114-115 (Trooper Cherry testified that Appellant told him the following: "[h]e said that he had gone to bed with the knives in his pockets and that he – he heard a noise. He said [the Victim] asked him to turn the heat up, and he got out of bed and turned the heat up and laid back down and then he believed that somebody was in the room so he pulled the knife out and started stabbing. And he heard a female voice say, stop, you're stabbing me"). Appellant's sufficiency claim thus fails.

Next, Appellant claims that the trial court abused its discretion at sentencing because: 1) the aggravated range sentence for his EWOC conviction was "based on factors that were not in evidence" and 2) the trial court "failed to place adequate reasons on the record for imposing [an aggravated range] sentence" on his EWOC conviction. Appellant's Brief at 23-27.

Appellant's claims challenge the discretionary aspects of his sentence. "[S]entencing is a matter vested in the sound discretion of the sentencing

judge, whose judgment will not be disturbed absent an abuse of discretion."

***Commonwealth v. Ritchey***, 779 A.2d 1183, 1185 (Pa. Super. 2001).

Pursuant to statute, Appellant does not have an automatic right to appeal the

discretionary aspects of his sentence.  ***See*** 42 Pa.C.S.A. § 9781(b).  Instead,

Appellant must petition this Court for permission to appeal the discretionary

aspects of his sentence.  ***Id.***

    As this Court explained:

> [t]o reach the merits of a discretionary sentencing issue, we conduct a four-part analysis to determine:  (1) whether appellant has filed a timely notice of appeal, Pa.R.A.P. 902, 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, [42 Pa.C.S.A.] § 9781(b).

***Commonwealth v. Cook***, 941 A.2d 7, 11 (Pa. Super. 2007).

    Generally, to raise a substantial question, an appellant must "advance

a colorable argument that the trial judge's actions were:  (1) inconsistent with

a specific provision of the Sentencing Code; or (2) contrary to the fundamental

norms which underlie the sentencing process."  ***Commonwealth v. McKiel***,

629 A.2d 1012, 1013 (Pa. Super. 1993); ***Commonwealth v. Goggins***, 748

A.2d 721, 726 (Pa. Super. 2000) (*en banc*).  Moreover, in determining whether

an appellant has raised a substantial question, we must limit our review to

Appellant's Rule 2119(f) statement.  ***Goggins***, 748 A.2d at 726.  This

limitation ensures that our inquiry remains "focus[ed] on the reasons for which

the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits." ***Id.*** at 727 (emphasis omitted).

Within Appellant's brief to this Court, Appellant claims that the trial court abused its discretion at sentencing because: 1) the aggravated range sentence for his EWOC conviction was "based on factors that were not in evidence" and 2) the trial court "failed to place adequate reasons on the record for imposing [an aggravated range] sentence" on his EWOC conviction. Appellant's Brief at 23-27.

Within Appellant's post-sentence motion, Appellant did not claim that the trial court erred when it based his EWOC sentence on "factors that were not in evidence." ***See id.***; ***see also*** Appellant's Post-Sentence Motion, 6/26/23, at 3-4. Therefore, this particular claim is waived. ***See*** Pa.R.Crim.P. 720; Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal"); ***Commonwealth v. Cartrette***, 83 A.3d 1030, 1042 (Pa. Super. 2013) (*en banc*) ("issues challenging the discretionary aspects of a sentence must be raised in a post-sentence motion or by presenting the claim to the trial court during the sentencing proceedings. Absent such efforts, an objection to a discretionary aspect of a sentence is waived").

Appellant also claims that the trial court abused its discretion because it "failed to place adequate reasons on the record for imposing [an aggravated range] sentence" on his EWOC conviction. ***See*** Appellant's Brief at 26. Based

upon our precedent, we conclude that the Commonwealth's claim raises a substantial question and that we may thus review the merits of the claim. *See Commonwealth v. Booze*, 953 A.2d 1263, 1278 ("an allegation that the court failed to state adequate reasons on the record for imposing an aggravated-range sentence . . . raises a substantial question"). Appellant's claim, however, fails.

As noted above, the trial court explained during sentencing:

> And I did want to say on the record that for the [EWOC] charge, that sentence is in the aggravated range; and that is due to, obviously, the severity of [Appellant's] actions.
>
> I find that – that he stabbed the [Victim] in this case while [the six-month-old baby] was [lying] next to her in the bed repeatedly. The attack continued throughout the room while [the Baby] was there. [The Baby] was eventually found in the bed under the covers. And throughout trial, we saw the bloodstains on that bed and covers and throughout the room. And for those reasons, I did aggravate the sentence as to that charge.

N.T. Sentencing, 6/16/23, at 63-64.

Moreover, the trial court explained in its opinion:

> [In sentencing Appellant to an aggravated range sentence for EWOC, the trial court] took into account the violent nature of the attack against [the Victim] and [the Baby's] proximity to [the] Victim and Appellant at the time of the attack. The court also considered the mitigating factors cited by Appellant such as his age, history of substance abuse, and lack of a "significant criminal history." However, the barbarity of the attack overcame any mitigating factor when deciding whether to place Appellant's sentence in the aggravated range. In particular, the court noted on the record that [the] Victim suffered "[40-]something stab wounds while [the Baby] was in very, very close proximity to that knife in the room." The [trial] court also reflected on how [the Baby] might have been

- 13 -

harmed had one of his parents fallen on him or accidentally hit him during the struggle. For these reasons, the [trial] court found that the attack went "above and beyond the means necessary to commit the crime of [EWOC]." Appellant's use of a knife to stab [the Victim] to death, the blade fragment in the blood-stained sheets where [the Baby] was discovered, the second broken knife discovered by Corporal Short outside of the bedroom, and the excessive number of stab wounds given to [the] Victim by Appellant demonstrated the barbarous nature of the attack in which [the Baby] was caught in the middle. Appellant was properly sentenced in the aggravated range.

Trial Court Opinion, 12/18/23, at 4-5 (citations omitted).

Again, we agree with the trial court's able analysis and conclude that Appellant's final claim on appeal fails.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/11/2025